UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RICK RUMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1248-JDT-TAB |
| | ) | |
| GENERAL REVENUE CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 37)[1]

Plaintiff, Rick Rumler ("Rumler"), was employed by Defendant, General Revenue

Corp. ("GRC"), as a Debt Collection Specialist ("debt collector") from August 4, 2003

until his employment was terminated in February 2005.  While employed at GRC,

Rumler was paid at an hourly rate, but also received compensation through GRC's

incentive bonus program.  This "bonus program" could be described as similar to

commission programs often used to compensate those working in the sales field.

Following GRC's termination of Rumler's employment, it did not pay him certain bonus

monies he believes he was entitled to.  These unpaid "bonuses" are the subject of this

litigation.

Rumler claims that GRC has violated Indiana's wage and hour laws by failing to

pay him the bonus money he earned.  He also contends that the failure to pay him the

---

[1]  This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

bonus monies constituted a breach of contract.  GRC has filed a motion seeking

summary judgment in its favor.  After a review of the record as submitted by the parties,

the court finds no remaining material questions of fact that would prevent the entry of

judgment in favor of GRC as a matter of law.

### I. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  The moving party has the initial burden of demonstrating that

the record shows no genuine issue of material fact, but if the nonmoving party bears the

ultimate burden of proof on an issue, then that party can avoid summary judgment only

by setting forth "specific facts showing that there is a genuine issue for trial."  *Celotex*,

477 U.S. at 324.  The evidence is construed in the light most favorable to the

nonmoving party and all reasonable inferences are drawn in that party's favor.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Only factual disputes that

have a bearing on the outcome of the lawsuit, in light of the substantive law, will

preclude summary judgment.  *JPM, Inc v. John Deer Indus. Equip. Co.*, 94 F.3d 270,

273 (7th Cir. 1996).

**II. Factual Background**

From the synopsis provided in the case management plan, the court understands that GRC is a wholly owned subsidiary of SLM Corporation, a/k/a Sallie Mae, the nation's largest student loan lender. GRC deals with delinquent loans and borrowers, providing what appears to be debt collection type services to its parent.  It hired Rumler on August 4, 2003, to work as a debt collector.  Rumler was an at-will employee whose duties included locating and contacting individuals who had outstanding student loans, in order to present them with options for repaying their debt.

Rumler was paid $10.40 per hour and typically worked an 8 to 5 day, Monday through Friday.  He also received substantial additional compensation through bonuses that were provided by GRC as incentives for debt collectors to meet specified monthly goals.  On February 7, 2005, Rumler's employment with GRC was terminated after he failed to call or report to work for three days, in violation of GRC's attendance policy. Rumler claims that he left voice mails for his supervisor explaining his absences and that he was terminated involuntarily because the supervisor apparently did not receive all his messages.  GRC claims Rumler's supervisor did not receive the messages and, regardless, his failure to make direct voice contact with his supervisor for three days, violated its "no call - no show" policy.  As a result of the breach of GRC's policy, Rumler was deemed to have voluntarily resigned.  However, as will be discussed, in the end the issue of whether or not his departure was voluntary or involuntary is immaterial.

Rumler does not dispute that he received his normal hourly compensation, nor does he claim that he was denied all of his bonuses.  His claim focuses on a category of bonuses referred to as "back-page bonuses."  It is necessary to examine GRC's system for awarding bonuses to debt collectors in order to fully comprehend the nature of Rumler's claims.

*GRC's Bonus Structure*

GRC provided incentives for debt collectors through two categories of bonuses. The first, commonly referred to as front-page goals or bonuses, were bonuses that were earned by a debt collector when he met his quotas for the amount of debt and number of debtors he was able to convince to commit to a particular type of repayment program. The three types of repayment programs that were offered to the debtor were, (1) lump sum, (2) rehabilitation or (3) consolidation.  The second category of bonus payment was referred to as the back-page bonuses[2], which were awarded after a certain number of payments on new rehabilitations or consolidations were made by the debtor or "funded" by the Department of Education.  This usually took approximately ninety days from the debtor's enlistment in one of those repayment programs.

---

[2]  The reference to front-page bonuses or goals is derived from the first page of a two-page monthly memorandum sent to debt collectors.  Likewise, back-page goals or bonuses are referenced as such because they appear on the back or second page of the memorandum.

*Front-Page Goals*

There were two categories of front-page bonuses which could be earned.  One front-page bonus was based on the debt collector meeting specific "direct-collect" goals for the amount of debt collected in a month from debtors making either rehabilitation payments, consolidation payments, or one-time payments that would eliminate their default or debt.  A second front-page bonus was earned when a debt collector met productivity targets tied to the overall number of debtors that the debt collector could convince to enlist in one of the repayment programs.

More specifically, two of the programs either restructured or provided an extended period to assist the debtor in relieving his delinquency.  "Rehabilitation" was a federal program that allowed debtors to reestablish a payment history to "fix" their credit. Once a sufficient payment history was established by the debtor during rehabilitation, the Department of Education would remove the debtor from default status.  Under this option, a debt collector was responsible for getting the debtor started on repayment and, once this was completed, the debt collector rarely had any further interaction with the debtor unless the debtor bounced a check.  "Consolidation" was another repayment program offered by the Department of Education through GRC.  It differed from Rehabilitation in that consolidation did not fix a debtor's default, but would instead consolidate the debtor's loans.  Like Rehabilitation, the debt collector was primarily responsible for getting the debtor started in the program, and had little if any interaction with the debtor after this occurred.

-5-

So, if a debt collector was able to direct-collect a sufficient amount in a month, he would receive a corresponding bonus with his second paycheck in the following month. If he was able to meet his quota for the number of debtors committed to Rehabilitation he received additional bonus money, and the same was true if he met his goal for enlisting Consolidations and his goal for keeping debtors, who previously committed to Rehabilitation, paying on those commitments.  However, as stated in each month's memorandum, these front-page goals also had to be met in order to receive 100 per cent of the back-page bonuses.

*Back-Page Bonuses*

Back-page bonuses were based on the continued success of debtors under either the Rehabilitation program or the Consolidation program.  Under Rehabilitation, a debt collector was eligible for a bonus if the debtor successfully made three consecutive monthly payments.  After the third payment, a type of "vesting" occurred and the debt would transfer to the "house route," which simply means that the obligation to monitor collection moved to another group of employees.  After this vesting and transfer of responsibility occurred, the debt collector would be awarded a bonus referred to as a "Rehabilitation Transfer Bonus."  If the debtor failed to make three consecutive payments, the loan would not transfer, and the debt collector would not be awarded a bonus.  Also, to obtain the entire available bonus amount, debt collectors would have to receive signed agreement letters back from seventy-five percent of the debtors they enlisted in Rehabilitation.

Under Consolidation, a debt collector was eligible for a bonus if the loan was successfully "funded" by a federal program that would pay off the defaulted loan and take control of the payments on the consolidated loans.  This too would typically take approximately ninety days after the initial agreement.  With Consolidation, vesting occurred once the loan funded.  At that point the debt collector would be eligible for a bonus based on the amount of the loan at the time of funding.  For a variety of reasons, Consolidations did not always fund.  Accordingly, a debt collector was never assured of receiving a corresponding back-page bonus.

Finally, and most importantly for purposes of this litigation, back page bonuses were contingent on the debt collector meeting the front-page goals of the current month. For example, an employee who successfully convinced a debtor to agree to Consolidation in October would be eligible for the back-page bonus associated with that Consolidation in January, if the Consolidation ran its typical course of ninety days to funding; however, the full amount of the bonus would not be received unless he met each of the front-page goals for January.  Rumler's supervisor, Thomas Smith, stated that "[t]he purpose of tying the back-page bonuses to the front-page goals was to motivate the collector to meet the front-page goals."  In other words, GRC attempted to keep the motivation of its debt collectors constant.

Rumler contends that for the first several months of his tenure he thought his back-page bonus was contingent on his having made his front-page goal numbers back during the month that the Consolidations or Rehabilitations had first been enlisted.  Not until he did not receive all of a particular month's back-page bonus did he become

aware that it was contingent on meeting the current month's front-page goals.  While he

did successfully challenge certain bonus calculations during his tenure, he did not raise

an objection to the bonus system structure until after his termination.  He claims in this

lawsuit that the back-pay bonuses amount to compensation that is earned three months

prior to payment and that he should receive back-page bonuses for those

Rehabilitations and Consolidations which were funded or vested after he left.

### III. Discussion

This matter made its way to this court via removal, and all parties agree that

Indiana substantive law applies.  Count I of the Plaintiff's complaint asserts claims under

Indiana's wage claims statute, Ind. Code § 22-2-9-2, which applies to employees who

were involuntarily separated from their employment.  Count II, pled in the alternative,

asserts claims under the Indiana's wage payment statutes, Ind. Code § 22-2-5-1

through § 22-2-5-3, which govern the timing and frequency of payment made to current

employees and those who have voluntarily left their employment.  Count III asserts a

breach of contract claim, but Count IV leaves the court somewhat confused.  It cites the

wage claims statutes again and makes essentially duplicate allegations, with what

appears to be a bit more emphasis on the calculation of bonuses during the months

prior to Rumler's departure.  In any event, the deposition testimony makes it clear that

the critical issues in this matter are whether or not GRC's interpretation of its own back-

page bonus program is correct under contract law and permissible under Indiana

statutory law.  GRC argues that it is entitled to summary judgment because the answer

to both those questions is an unquestionable yes.

With respect to the claim of breach of contract, the only evidence offered of a breach by the Plaintiff is his own interpretation of the monthly bonus memoranda. Under his interpretation, the back-page bonus contingencies should be interpreted as applying to a debt collector's front-page performance in the past, when particular debtors agreed to be enlisted in a particular program, rather than at the time that the enlisted debts vest, with a third payment or the confirmation of Department of Education funding of the consolidation loan.  Such an interpretation cannot be correct.

As a preface to the explanation of why the Plaintiff's proffered construction is not well-founded, it should be noted that the parties have agreed that the bonus memos and the specific numbers and percentages used in the bonus formulas are confidential and sensitive trade information and entered into a stipulated protective order to keep such trade secrets out of the public record.  However, no trade secret is revealed by the court stating that each memo contained the following statement, in plain view, on the front page after the targeted numbers and percentages for the two categories of front-page goals were set forth: "Achievement of the Direct Collect Goal & Productivity Targets impacts the Consolidation Funding Bonus and Rehabilitation Transfer Bonus on the following page."  The court finds no ambiguity in that statement and that no reasonable person could interpret that statement to mean that his eligibility for the Consolidation Funding Bonus and Rehabilitation Transfer Bonus earned that month was subject to his meeting the front-page goals from two or three months previous.  Further, it should be noted that Rumler actually spent a year and one-half working under the company interpretation of the plan without complaint and suddenly determined that the company's

interpretation of the bonus policy was a breach of its contract with him, after he was deemed to have abandoned his job.  Perhaps his previous silence was dictated by the fact that, according to an uncontested submission from GRC, Rumler would have received less bonus pay during his tenure if he would have been paid in accordance with the interpretation of the bonus plan he is proffering in this action.  In any event, the breach of contract claim in Count III must fail.

With the question of whether Rumler is owed any money under the theory of contract breach answered in the negative, the next question is whether, regardless of contract, either of the Indiana statutes required that Rumler be paid more than he actually received.  He contends that whether his departure was voluntary or involuntary remains a disputed fact, which precludes summary judgment on the claims in Counts I and II with regard to payment of wages upon termination.  The voluntary or involuntary nature of his departure is immaterial and a "red herring" issue.  The key, rather, is whether the unpaid bonuses claimed by the Plaintiff are "wages" under Indiana law, which would obligate GRC to timely compensate Rumler.  That is true because in order to fall under either of the potentially applicable statutes, the bonus would have to constitute "wages" as that term has been defined by statute and interpreted by the courts.

The Indiana legislature has defined the term "wages" to mean "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount."  Ind. Code § 22-2-9-1(b).  Further, the law "does not exclude

a bonus as wages simply because it is denominated as a 'bonus.'"  *Gurnik v. Lee*, 587

N.E.2d 706, 709 (Ind. Ct. App. 1992).  To find otherwise "would allow employers to

escape the statutory penalties by merely labeling compensation as 'bonuses.'"  *Id.*

Therefore, to answer the question of whether GRC's back-page bonuses are wages to

Rumler, this court must consider the statutory definition and "look to the substance of

the compensation."  *Id.*

The Indiana Supreme Court has opined on whether a bonus can be a wage and

stated that "[a] 'bonus' is a wage 'if it is compensation for time worked and is not linked

to a contingency such as the financial success of the company.'"  *Highhouse v. Midwest*

*Orthopedic Inst., P.C.*, 807 N.E.2d 737, 740 (Ind. 2004) (citing *Pyle v. Nat'l Wine &*

*Spirits Corp.*, 637 N.E.2d 1298, 1300 (Ind. Ct. App. 1994)); *see also Whitsell v.*

*Bradshaw Ins. Group, Inc.*, 321 F. Supp. 2d 983, 988 (N.D. Ind. 2004) ("Simply put, in

Indiana, it still appears to be good law that a bonus that is linked to some type of

contingency, like the financial success of the company, is not considered a wage for

purposes of the Indiana Wage Payment Statute.").  Rumler contends that because his

bonuses were not contingent on GRC's financial success, he his entitled to

compensation.  However, he ignores the fact that the Indiana Supreme Court did not

limit the applicable contingency to company success or performance.

In *Highhouse*, Dr. Michael Highhouse worked as an orthopedic surgeon at an

orthopaedic institute and was paid a bonus at the end of each calendar quarter, based

on collections for services rendered less an allocation of expenses incurred as a part of

the overall operations at the institute.  *Highhouse,* 807 N.E.2d at 738.  The doctor, gave

-11-

notice of his resignation and departed approximately four months later.  *Id.* at 739.  After

his departure, Highhouse's employer continued to receive collections for the doctor's

services.  *Id.*  He sued to receive bonus payments based on those post-departure

collections.  The court agreed with the defendant institute that the doctor was not

entitled to compensation, stating, "[W]hile it is clear that Highhouse's efforts contributed

to the calculation of his bonus, they were not the sole factor."  *Id.* at 740.  Thus, while

the court considered that the plaintiff's past productivity was a part of what went into the

calculation of the bonus, it also considered contingent factors that affected the

company's financial success, which were beyond the plaintiff's control.

In his deposition, Rumler stated that as long as a debtor did not bounce a check

during the first three months under the rehabilitation program he would receive a back-

page bonus after the third payment was made.  Also, under this repayment program,

Rumler needed to receive signed agreement letters from seventy-five percent of the

contacted debtors, to qualify for a portion of the bonus.  The debtors were allowed to

return the letters up to the third month following the initial consultation.  Finally, under

the consolidation program, Rumler stated that as long as the government funded the

loan, then the debt collector would receive a bonus, but he conceded that not all

consolidation loans proposed were actually funded.[3]  So, the back-page bonuses

associated with both Consolidation and Rehabilitation are, in part, based on factors that

---

[3]  Because there are sufficient contingencies outside of Plaintiff's control for the court to
determine that the back-page bonuses were not wages, it need not decide whether an employer
can avoid having a bonus deemed a "wage" by requiring that the employee be performing at a
certain level when the bonus vests.  The Supreme Court of Indiana is a more  appropriate
judicial body to render such a decision under Indiana law.

-12-

are beyond Plaintiff's, or any other debt collector's, personal control.  Rumler, in

essence, admitted in deposition to not knowing with certainty whether each of the

debtors he enlisted in programs during December 2004 or January 2005 made all

payments, returned a signed agreement letter or had their Consolidation loan funded

subsequent to his departure.

In the case at bar, because the GRC back-page bonuses were contingent

compensation and not "wages", they were not due and owing to Rumler under Ind.

Code § 22-2-9-2, when they vested after his departure.  Further, the requirement under

Ind. Code § 22-2-5-1 that regularly scheduled paychecks (including those for

employee's who have resigned) include payment of all wages earned up to ten days

prior to the issuance of the paycheck does not apply to such a contingent bonus either.

So, regardless of whether he departed voluntarily or involuntarily, neither Indiana's

wage payment statute nor its wage claim statute applies to the bonuses he claims he

was owed.

### IV. Conclusion

Rumler believes that he is owed compensation because while employed he

initiated a process that may have led to him being paid a bonus if he had remained with

GRC.  However, the contingent nature of any further bonus payment eliminates the

application of any Indiana statutory remedy which would require such payment.

Further, the bonus memoranda he relies upon as a contract is unambiguous and does

not entitle him to any further back-page bonus payments because he was not employed

nor meeting certain contingencies clearly set forth in the document when those bonuses

vested.  Therefore, no question of material fact remains and GRC's Motion for Summary

Judgment (Document #37) is **GRANTED**.

ALL OF WHICH IS ENTERED this 1st day of May 2007.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Scott Martin Dillon
scottdillon@hotmail.com

Kristin B. Keltner
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
kristin.keltner@odnss.com

Brian L. McDermott
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
brian.mcdermott@odnss.com